# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID DAY,
          *Plaintiff-Appellant,*

v.

AT&T DISABILITY INCOME PLAN,
          *Defendant-Appellee.*

No. 10-16479

D.C. No.
5:06-cv-01740-JW

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Northern District of California
James Ware, Chief District Judge, Presiding

Argued and Submitted
August 30, 2011—San Francisco, California

Filed July 3, 2012
Amended November 1, 2012

Before: Raymond C. Fisher and Johnnie B. Rawlinson,
Circuit Judges, and Robert J. Timlin, District Judge.*

Opinion by Judge Fisher

*The Honorable Robert J. Timlin, Senior United States District Judge
for the Central District of California, sitting by designation.

13039

**COUNSEL**

Robert Nichols, San Jose, California, for the appellant.

Stephen H. Harris (argued), Caroline L. Elkin and Melinda A. Gordon, Paul, Hastings, Janofsky and Walker LLP, Los Angeles, California, for the appellee.

**ORDER**

The opinion filed July 3, 2012, and reported at 685 F.3d 848, is amended as follows:

At slip opinion page 7859 n.6, 685 F.3d at 857 n.6, replace the sentence <To the extent Day requests fees for time spent pursuing summary judgment, he is not a prevailing party and is not therefore entitled to fees.> with <To the extent Day requests fees for time spent pursuing summary judgment, he is not entitled to fees because he did not achieve success on the merits.>.

With this amendment, the panel has voted to deny Appellant's petition for panel rehearing. Judges Fisher and Rawlinson have voted to deny the petition for rehearing en banc and Judge Timlin so recommends.

The full court has been advised of the petition for rehearing en banc and no active judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.

Appellant's petition for panel rehearing and rehearing en banc, filed August 17, 2012, is **DENIED**.

No future petitions for rehearing or rehearing en banc will be entertained.

---

**OPINION**

FISHER, Circuit Judge:

David Day, an ERISA plan beneficiary, elected to roll over his pension benefits into an individual retirement account (IRA) upon separation from his employer, AT&T. Exercising its discretion, the plan's claims administrator construed Day's lump sum rollover as the equivalent of his having "received" his pension benefits and, according to the terms of AT&T's Disability Income Benefit Plan, reduced Day's long-term disability (LTD) benefits by the amount of the rollover. Day argues that having his pension payout deposited directly into an IRA subject to tax penalties for early withdrawals meant he did not actually receive the funds, an interpretation that finds support in *Blankenship v. Liberty Life Assurance Co. of Boston*, 486 F.3d 620, 624-25 (9th Cir. 2007). Reviewing the claims administrator's decision for an abuse of discretion, however, we must defer to the administrator's reasonable interpretation of the plan. We also reject Day's further contentions that AT&T failed to sufficiently disclose the possibility

that his LTD benefits would be reduced by his receipt of pension benefits, and that the administrator's actions violate the Age Discrimination in Employment Act (ADEA). Accordingly, we affirm the judgment of the district court.

## I.   Background

David Day began working for Pacific Bell Telephone Company, a subsidiary of AT&T Inc., in 2000. As an AT&T employee, he participated in the AT&T Pension Benefit Plan and the AT&T Disability Income Plan (the "Plan").[1] In February 2005, he stopped working because of a disability. He began receiving LTD benefits under the Plan, and for reasons not relevant here, AT&T terminated Day's employment in August 2005.

In October 2005, Day chose to roll over his pension benefits into an IRA. In accordance with his election, the AT&T Pension Benefit Plan administrator sent Day a check in the lump sum amount of $17,203.93, payable to the trustee of his IRA.

In August 2008, Sedgwick Claims Management, Inc. (Sedgwick), the Plan's claims administrator, determined that Day's LTD benefits would be reduced by the amount of the rollover. The Plan provided that LTD benefits would be "reduced by . . . pension benefits you may *receive* from any SBC company pension plan" (emphasis added). The Plan stated:

> If you are eligible and apply for pension benefits (including a Disability Pension, if applicable), your pension benefit, to the extent paid to you, will be subtracted from your LTD payments. (If you elect a cashout, the equivalent monthly amount will be cal-

[1]When Day filed this action he was employed by SBC. SBC subsequently acquired AT&T. The parties do not dispute that SBC and AT&T are the same entity for purposes of this lawsuit.

culated and used as the factor for integration with LTD payments.) If you are eligible but elect to defer applying for any applicable pension benefit, your LTD payments will not be reduced by any pension benefits you are entitled to until such time as you apply for and are *actually paid* the pension benefit.

(Emphasis added.) Relying on these provisions, Sedgwick concluded that Day had received his pension benefits and reduced pro rata Day's LTD monthly benefits by $74.71, resulting in a net benefit of $1,767.39 per month.

Day protested that his LTD benefits should not have been reduced because he had neither "received" nor been "actually paid" the pension benefits. Rather, they had been deposited directly into his IRA, which imposed restrictions on his access to the funds, including substantial penalties for early withdrawals. Sedgwick interpreted the Plan differently.[2] In Sedgwick's view:

> By electing to have his pension benefit paid from the pension plan, Mr. Day "received" his pension benefit for purposes of determining his disability benefit. Once outside of the pension plan, the proceeds were no longer subject to the rules of the pension plan. Indeed, although held by a trustee, the economic reality is that the proceeds were under the *full dominion and control* of Mr. Day, to be invested as Mr. Day saw fit, and to be paid out to Mr. Day at times and in amounts as determined by Mr. Day in his sole discretion and utterly unfettered by any of the rules or requirements of the pension plan from which they had come. Mr. Day most certainly had "received" his pension benefit.

---

[2]Sedgwick explained its reasons in February and October 2009 letters to Day.

(Emphasis added.) Sedgwick also "interpret[ed] the election to take the benefits from the Pension Plan as having been *actually paid* to the participant." (Emphasis added.) In justifying its interpretation, Sedgwick rejected Day's reliance on *Blankenship* where, in the context of a *non*discretionary plan, we construed "receive" in the beneficiary's favor as not including a rollover of pension benefits into an IRA. *See* 486 F.3d at 624-25.

Ruling on cross motions for summary judgment, the district court sustained Sedgwick's interpretation. The court concluded that Sedgwick's interpretation of the Plan was entitled to deference because "the Plan language unambiguously imparts full discretionary authority on the Plan Administrator to interpret the provisions of the Plan and to make eligibility determinations as needed." The court rejected Day's arguments for applying a lesser standard of review. Reviewing for an abuse of discretion, the court concluded that it was "not unreasonable to interpret the Plan to include [Day's] rollover within the ambit of 'pension benefits [the participant] may receive,' " and affirmed Sedgwick's decision to reduce Day's benefits by the amount of the rollover.

The district court entered judgment in favor of the Plan, and Day timely appealed. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## II.   Interpretation of the Plan Under ERISA

### A.   The District Court Properly Reviewed for Abuse of Discretion

Day first challenges the district court's ruling that Sedgwick's interpretation of the Plan is reviewed for an abuse of discretion. Although Day concedes that the Plan conferred discretion on Sedgwick as claims administrator, he maintains that because Sedgwick was (1) biased or conflicted; (2) provided inconsistent reasoning for its denial; and (3) engaged in

procedural misconduct, heightened or de novo review is required. We review this question de novo. *See Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc) ("We review de novo a district court's choice and application of the standard of review to decisions by fiduciaries in ERISA cases" and "review for clear error the underlying findings of fact."); *see also Pannebecker v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1213, 1217 (9th Cir. 2008).

Because the Plan conferred full discretion on Sedgwick, unless Day's allegations of bias and misconduct are both true and warrant less deference, the district court correctly reviewed for an abuse of discretion. *See Abatie*, 458 F.3d at 967 (holding abuse of discretion review is required whenever an ERISA plan grants discretion to the plan administrator, but such review is informed by any conflict of interest appearing in the record). The district court did not err in finding no inherent or structural conflict of interest. The Plan is funded by AT&T and not Sedgwick, and administered by Sedgwick and not AT&T. *See Abatie*, 458 F.3d at 967 (a reviewing court must always consider the "inherent conflict that exists when a plan administrator both administers the plan and funds it"). Nor did the court err in rejecting Day's allegations of actual conflict of interest. Just because Sedgwick consulted with AT&T in responding to Day's concerns about his rolled over pension benefits being received by the IRA does not show that AT&T had any influence over Sedgwick's decision making process in this regard.

Day's remaining contentions are likewise without foundation. Although he is correct that we generally apply de novo review when an administrator engages in "wholesale and flagrant violations of the procedural requirement of ERISA," *id.* at 971, and thus "fails to exercise discretion[,]" *id.* at 972, Day failed to present material or probative evidence in support of these bold assertions. At best he showed only that Sedgwick in its February 2009 and October 2009 letters elaborated on its initial reasons for rejecting his appeal, and that

AT&T failed to provide him with copies of various documents that he was instead required to obtain from a separate AT&T office. *Cf. id.* at 972 ("[W]hen a plan administrator's actions fall so far outside the strictures of ERISA that it cannot be said that the administrator exercised the discretion that ERISA and the ERISA plan grant, no deference is warranted."). In sum, the district court correctly rejected Day's allegations of misconduct by the claims administrator and properly reviewed for abuse of discretion. *See Abatie*, 458 F.3d at 967.

### B.  Sedgwick Did Not Abuse Its Discretion in Interpreting the Plan

Under the deferential abuse of discretion standard of review, "the plan administrator's interpretation of the plan 'will not be disturbed if reasonable.' " *Conkright v. Frommert*, 130 S. Ct. 1640, 1651 (2010) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111 (1989)). "ERISA plan administrators 'abuse their discretion if they render decisions without any explanation, . . . construe provisions of the plan in a way that conflicts with the plain language of the plan' " or "rel[y] on clearly erroneous findings of fact." *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472-73 (9th Cir. 1994) (quoting *Eley v. Boeing Co.*, 945 F.2d 276, 279 (9th Cir. 1991)), *abrogated on other grounds by Abatie*, 458 F.3d at 973. Applying these criteria, we hold that Sedgwick did not abuse its discretion.

Day's chief arguments are that the Plan language prohibited the offset of the pension plan benefits against the LTD benefits, as applied by Sedgwick, and that *Blankenship* barred the offset. We disagree.

**[1]** We begin with the relevant portions of the Plan and related documents that Sedgwick interpreted in reaching its offset determination.[3] First, the Plan benefit formula man-

---

[3]Although Day argues that the district court erred by deferring to what he describes as Sedgwick's interpretation of *statutory* terms, Sedgwick did

dated certain offsets to LTD benefits, as did the Summary Plan Description (SPD). The Plan's offset provision (section 4.2) was set forth in a section entitled "Benefits from Other Sources" and stated:

> *In addition to those listed in the applicable SPD*, other benefits that reduce Benefits paid under the Plan include all benefits for which the Employee would be eligible if he applied for them, whether or not he actually receives them.

(Emphasis added.) The SPD stated:

> The plan provides you with an LTD benefit . . . reduced by . . . pension benefits you may receive from any SBC company pension plan . . . .
>
> . . .
>
> If you are eligible and apply for pension benefits (including a Disability Pension, if applicable), your pension benefit, to the extent paid to you, will be subtracted from your LTD payments. (If you elect a cashout, the equivalent monthly amount will be calculated and used as the factor for integration with LTD payments.) If you are eligible but elect to defer applying for any applicable pension benefit, your LTD payments will not be reduced by any pension benefits you are entitled to until such time as you apply for and are actually paid the pension benefit.

not engage in statutory interpretation, nor does Day cite any authority in support of his contention that Sedgwick was required to look beyond the Plan to the ADEA's definition of such terms as "receive" and "paid." Moreover, even assuming Sedgwick was required to look to the ADEA, Day fails to explain why interpreting the statute would result in an understanding of "receive" or "paid" substantially different from that arrived at by Sedgwick in interpreting the Plan.

Accordingly, the Plan and SPD provide that Day's LTD benefits would be offset by any pension benefit: (i) for which he elected a cashout ("If you elect a cashout, the equivalent monthly amount will be calculated and used as the [offset] factor"); (ii) for which he was paid ("your pension benefit, to the extent paid to you, will be subtracted from your LTD payments"); or (iii) which he received ("[your] LTD benefit [will be] . . . reduced by benefits you may receive from . . . any SBC company pension plan").

[2] Sedgwick's conclusion that Day received his pension benefits when he rolled them into an IRA was not an unreasonable interpretation. To "receive" means to "take into possession or control." *Blankenship*, 486 F.3d at 624-25; *see* American Heritage Dictionary 1467 (5th ed.) (defining "receive" as "[t]o take or acquire (something given or offered)"). When a beneficiary rolls a pension into an IRA, he may not take *possession* of it, but he has *control* over the assets. For instance, he can choose the IRA and change it; and he can withdraw funds from it, albeit perhaps having to pay penalties for early withdrawal. It is therefore not unreasonable to say that he has *received* these benefits.

Day contends this conclusion is in conflict with *Blankenship*. It is not, because our holding there is plainly distinguishable. We determined that a plan providing for an offset for pension benefits received by a beneficiary was ambiguous, because "receive" can mean either possession or control. *See Blankenship*, 486 F.3d at 624-25. Reviewing de novo and applying the doctrine of *contra proferentem* ("ambiguities are to be construed unfavorably to the drafter" Black's Law Dictionary 377 (9th ed. 2009)), we construed the ambiguity against the Plan and held that "receive" referred to funds actually coming into the possession of a beneficiary. *See Blankenship*, 486 F.3d at 625. Therefore, funds rolled over to an IRA were not to be used to offset disability benefits. *See id.* at 627.

**[3]** In rejecting *Blankenship* as controlling, Sedgwick correctly explained to Day that the case by its own terms does not apply here. As we acknowledged, *contra proferentem* applies when a plan does not grant a plan administrator discretion to interpret ambiguous plan terms; the doctrine does not apply when a plan "grants the administrator discretion to construe its terms." *Id.* at 625.[4] In the latter context, it is the administrator who resolves ambiguities in the plan's language. *See Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 554 (9th Cir. 1995) (so holding). Because Sedgwick had discretion to interpret the Plan, the only question is whether Sedgwick's interpretation of "receive" to include Day's control of his IRA funds was unreasonable. *See Conkright*, 130 S. Ct. at 1651. It was not. The administrator therefore did not act unreasonably in concluding that Day had received pension benefits, and appropriately reduced his LTD benefits to account for the rollover.

### III.   AT&T's Duty to Disclose

**[4]** Day faults AT&T for failing to disclose to him the disadvantages of choosing the IRA option, particularly its effect on his LTD benefit payments. Upon termination of his employment, Day had several options for his pension. Apparently unaware of these consequences, he chose the IRA rollover not knowing that this seemingly insignificant election could cost him $17,000 in disability benefits to which he was otherwise entitled. Day concedes that AT&T did nothing to compel him into making this election, nor did it give him any false information regarding his choices. But he contends that AT&T breached its statutory and common law fiduciary duties by failing to affirmatively advise him of the financial consequences that could arise were he to elect a rollover. Although we have some sympathy for this argument in gen-

---

[4]We also noted that the doctrine does not apply to a "self-funded" plan. *Blankenship*, 486 F.3d at 625. Sedgwick also properly invoked this exception.

eral, it is not compelling here. First, Day argues that the 2002 SMAART Guide he received did not include any explanation of the possible benefits offset and did not refer the reader to the SPD, which contained a more in-depth description of the offsetting policy. AT&T responds that this omission was corrected in the 2005 SMAART Guide sent to all employees that explicitly refers participants to the SPD, but Day disputes receiving it. In any event, he does not dispute that he had access to the SPD itself, which explained the offset policy at some length. Thus, the undisputed evidence shows that at the relevant times during his employment, AT&T furnished Day with Plan documents explicitly stating that disability benefits would be offset by pension benefits received or paid.

Second, we find no legal basis for Day's contention that, at the time of his separation from employment, AT&T was under an affirmative obligation to remind Day of the offset provisions or to advise him in particular that electing a lump sum rollover of his pension benefits could result in a substantial reduction of his LTD benefits or a tax penalty. Day relies on cases in which employers deceived beneficiaries to evade plan obligations. *See, e.g.*, *Varity Corp. v. Howe*, 516 U.S. 489, 493-94 (1996); *Farr v. U.S. W. Commc'ns, Inc.*, 151 F.3d 908, 911-12 (9th Cir. 1998); *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 374-76 (4th Cir. 2001).

**[5]** Here, by contrast, Day asserts only the failure to mail him a reminder of information that was already contained in the SPD, not a scheme to "deceiv[e] a plan's beneficiaries in order to save the employer money at the beneficiaries' expense." *Varity*, 516 U.S. at 506. It might seem a simple matter, for example, for AT&T to have imprinted a reminder of potential disability benefits offsets on the form Day used to exercise his distribution option. *Cf. Chappel v. Lab. Corp. of Am.*, 232 F.3d 719, 726-27 (9th Cir. 2000) (holding that an ERISA plan administrator would have breached its fiduciary duty if it adopted a mandatory arbitration clause with a 60-day time limit in which to demand arbitration, and gave notice of

the clause and its terms only in a summary plan description contained in an employment manual). However, such advice would not be relevant to all users of the rollover procedure and there is no legal requirement that such a form include warnings of all potential consequences when plan documents already contain that information for the employee. *Cf. Farr*, 151 F.3d at 915 (observing that there is no "duty to provide Plaintiffs with individualized notice of all the ways the tax laws would impact each of their individual distributions"). AT&T thus did not breach its fiduciary duties by failing to disclose information.

## IV.   ADEA Compliance

Finally, Day contends that offsetting LTD benefits by pension benefits violates the Age Discrimination in Employment Act (ADEA) and runs afoul of *Kalvinskas v. California Institute of Technology*, 96 F.3d 1305 (9th Cir. 1996).

### A.   AT&T Waived Its Argument that the ADEA Does Not Apply

**[6]** As a preliminary matter, we hold that AT&T waived the argument that the ADEA does not apply as a matter of law. The protections of the ADEA apply only to employees at least 40 years of age. *See* 29 U.S.C. § 631(a). Here, AT&T argues that Day was only 39 at the time any ADEA violation may have occurred, so his ADEA claims fail as a matter of law. Because AT&T raised this issue for the first time at oral argument, we must decide whether AT&T has waived the issue. To do so, we must first ascertain whether the ADEA's age requirement is jurisdictional or an element of a claim. A jurisdictional defect can be raised at any time, and cannot be waived, whereas an argument that the plaintiff failed to satisfy an element of a claim does not ordinarily affect the subject matter jurisdiction of the court, and may therefore be waived. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506-07 (2006).

We recently considered a similar question in the ERISA context. *See Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 979 (9th Cir. 2012) (holding that whether a plaintiff is a plan participant for purposes of ERISA is a substantive element of his claim, not a prerequisite for subject matter jurisdiction). In *Leeson*, we explained that "the only limitation to invoking federal court jurisdiction under [ERISA] relates to the categories of individuals entitled to initiate a civil action in state or federal court." *Id.* at 978; *see also* 29 U.S.C. § 1132(a)(1)(B) ("A civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."). The definition of participant under ERISA, by contrast, "appears in a separate provision that does not speak in jurisdictional terms or refer in any way to the jurisdiction of the district courts." *Leeson*, 671 F.3d at 978 (internal quotation marks omitted). It thus "serves [only] to identify those plaintiffs who may be entitled to relief, not to limit the authority of federal courts to adjudicate claims under ERISA." *Id.*

**[7]** Here, like the definition of "participant" under ERISA, the ADEA's age requirement appears in a separate provision that "does not speak in jurisdictional terms." *Id.* (internal quotation marks omitted); *see also* 29 U.S.C. § 631(a) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age."). Accordingly, we hold that the age requirement does not affect this court's subject matter jurisdiction. *See Leeson*, 671 F.3d at 979*; see also Arbaugh*, 546 U.S. at 516 (explaining that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character"). Because AT&T failed to raise this issue during administrative review, in the district court or in it its response brief to this court, the age issue is waived.

## B.    The ADEA and *Kalvinskas* Do Not Prohibit the Offset

**[8]** Applying the ADEA, we hold that the offset does not violate the ADEA or our decision in *Kalvinskas*. *Kalvinskas* involved employer Caltech's attempt to offset an employee's LTD benefits with monthly retirement benefits for which the employee was *eligible*, but which he could not actually receive unless he retired, which he had not yet done. *See* 96 F.3d at 1307. We held that such an offset violated § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), because it coerced the employee to retire in order to receive the full value of the offset. *See id.* at 1307-08.

We also held that Caltech's policy was not protected under an ADEA safe harbor applicable to employers that "provide[ ] a bona fide employee benefit plan or plans under which long-term disability benefits received by an individual are reduced by any pension benefits (other than those attributable to employee contributions) . . . paid to the individual that the individual *voluntarily elects* to receive," 29 U.S.C. § 623(l)(3) (emphasis added). *See Kalvinskas*, 96 F.3d at 1309-10. The safe harbor is designed to prevent an employee from double-dipping by receiving both disability and pension benefits at the same time. *See id.* at 1309. Caltech's plan had the effect of forcing its employee to retire, triggering concurrent payments of disability and pension benefits, contrary to the safe harbor's purpose. *See id.* at 1309-10.

**[9]** The circumstances here are distinguishable. Day's rollover election was independent of any retirement decision. Unlike Mr. Kalvinskas, under AT&T's plan Day would have received full LTD benefits without having to retire.[5] Addition-

---

[5]We also conclude that the district court did not err in finding that "there is no evidence that [Day's] election to rollover his lump-sump pension benefit into an IRA account was not fully voluntary." *See Abatie*, 458 F.3d at 962.

ally, Day arguably would achieve the kind of double-dipping the ADEA safe harbor is designed to allow employers to prevent. If Day's interpretation of the Plan were correct, he would be able to roll over his pension benefits into an IRA, continue to receive full LTD benefits and have the option of withdrawing from his IRA (albeit at the cost of a tax penalty), thus circumventing the Plan's attempt to prevent double-dipping. We therefore hold that Sedgwick's decision to offset Day's LTD benefits did not violate the ADEA or *Kalvinskas*.

## V.   Conclusion

The district court properly applied an abuse of discretion standard of review and correctly affirmed the administrator's decision to offset Day's LTD benefits by the amount of his pension benefits distribution. Day failed to show violations of ERISA's notice requirements or the ADEA. The judgment of the district court is therefore affirmed.[6]

**AFFIRMED.**

---

[6]To the extent Day requests attorney's fees for the time spent seeking LTD benefits from the Plan while this case was stayed in the district court, his request is moot because the district court recently ruled on his entitlement to fees for this period. To the extent Day requests fees for time spent pursuing summary judgment, he is not entitled to fees because he did not achieve success on the merits.